1  David N. Lake, Esq., State Bar No. 180775
   **LAW OFFICES OF DAVID N. LAKE**
2   **A Professional Corporation**
   16130 Ventura Boulevard, Suite 650
3  Encino, California 91436
   Telephone: (818) 788-5100
4  Facsimile: (818) 479-9990
   david@lakelawpc.com
5

6  *Attorney for Plaintiff Gabriel Rodrigues*

7

8  [Additional counsel on signature page]

9              **UNITED STATES DISTRICT COURT**
10      **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
                **SAN FRANCISCO DIVISION**
11

12
   | | |
   |---|---|
   | GABRIEL RODRIGUES, Individually and on Behalf of All Others Similarly Situated, | Case No. |
   | Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
   | v. | |
   | SUNPOWER CORPORATION, PETER FARICY, THOMAS WERNER, AND ELIZABETH EBY, | |
   | Defendants. | |

## I.    INTRODUCTION

1.    Plaintiff Gabriel Rodrigues, by and through his undersigned counsel, respectfully submits this Class Action Complaint ("Complaint") alleging claims pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, against Defendants SunPower Corporation, and its present and former executives, Peter Faricy, Thomas Werner and Elizabeth Eby.  Plaintiff brings these claims on behalf of himself and all persons and entities who purchased or otherwise acquired SunPower Corporation ("SunPower" "SPWR" or the "Company") common stock between May 3, 2023 and July 19, 2024, both dates inclusive (the "Class Period").  This group is referred to as the "Class."  Excluded from the Class are Defendants, their families, and their affiliates.  Plaintiff alleges the following based upon information and belief, except as to those allegations concerning Plaintiff which are alleged upon personal knowledge.  Plaintiff's information and belief are based upon, *inter alia*, counsel's investigation, which includes a review and analysis of: (1) SunPower's filings with the SEC; (2) press releases and media reports issued and disseminated by the Company; (3) analyst and media reports concerning the Company; and (4) other public information regarding the Company, including statements made by SunPower executives.

## II.    SUMMARY OF THE ACTION

2.    SunPower, a Delaware corporation headquartered in Richmond, California, trades on the Nasdaq Stock market under the symbol "SPWR."  The Company provides photovoltaic ("PV") solar energy generation systems and battery energy storage products.  Its solar solutions are designed for residential customers, with PV systems that convert sunlight into electricity using semiconducting materials.

1

3.     The Class Period begins on May 3, 2023, in the midst of a challenging year for the Company.  During that time, the Company edged closer to violating certain critical thresholds contained in financial covenants with its lenders, which violations would give its lenders the right to demand immediate repayment of all amounts owed.

4.     When SunPower announced on October 24, 2023, that it would need to restate its financials for several preceding reporting periods because of an overstatement of the value of its consignment inventory, investors were obviously concerned as to whether the restatement would push SunPower into a breach of those financial covenants.

5.     The Company's October 24, 2023 statement, however, blithely assured investors that SunPower was "negotiating the terms and conditions of a consent and waiver to address the effects of the Restatement" on one of its credit agreements. The reasonable conclusion drawn therefrom was that SunPower was not yet in breach of its financial covenants and was seeking waivers to avoid such breach and default when it issued its restatement,

6.     On November 1, 2023, a week after SunPower announced the need  for  a restatement and disclosed that it was in discussions with its lenders regarding the effects of the restatement on its covenants, the Company held an earnings-related conference  call.  On that call, a Goldman Sachs market analyst pressed Defendants on whether the Company was currently in breach of any of its four financial covenants, and whether instead the Company would be in compliance with its covenants until the end of the year.  In response, SunPower's CFO Elizabeth Eby misleadingly stated that the Company was "fine" with respect to its covenants in Q3 2023.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

7.     In fact, as of the end of Q3 2023 on October 1, 2023, and well before the November 1, 2023 call, the Company was already in breach of its financial covenants with its lenders.  Accordingly, far from being "fine in Q3," the Company was facing an immediate obligation to repay its loans in full, which would have forced the Company into bankruptcy.

8.     That the Company was actively concealing it dire situation could be discerned from a series of disclosures by SunPower in December 2023 and February 2024.

9.     On December 11, 2023, the Company announced that it had secured a temporary waiver of "existing and certain anticipated defaults and events of default . . . related to the breach of a financial covenant and a reporting covenant." In other words, Defendants admitted that SunPower had breached some covenants and was anticipating breaching others, without specifying which were which. SunPower's share price dropped from $4.80 to $4.43, or 7.7%, in response to this news.

10.     Then, a week later, on December 18, 2023, SunPower disclosed that it was currently in breach of its financial covenants, and had been as of Q3 2023, permitting lenders to demand immediate repayment of loans that the Company could not possibly repay immediately. For this reason, the Company was forced to issue a "going concern" warning, casting doubt on SunPower's ability to operate for another 12 months. These announcements caused SunPower's share price to substantially depreciate, plunging from $6.14 to $4.22, or over 31%, on this news.

11.     Some of the risks of financial upheaval from the breaches of financial covenants that SunPower had concealed with its misstatements materialized in a series of disclosures made between February 15-24, 2024. SunPower revealed that it had obtained permanent waivers of the events of default, but the relief came at a

steep cost: the Company was forced to issue warrants to its lenders that gave them the right to buy huge amounts of equity at below-market prices, thereby diluting existing shareholders. Upon announcement of this costly life raft and its consequences, SunPower's share price fell from $4.26 to $3.18, or 25.4%.

12.    This was not the end of Defendants' ruse, though, and the Company continued to conceal the full extent of its dire predicament. There was much more to be revealed.  Not only had Defendants covered up breaches of its financial covenants, but the Company's collapsing finances had led it to struggle with its cash position.  SunPower even lacked sufficient cash to meet its obligations to its suppliers.  While Defendants were telling investors in May and August 2023 that the Company had sufficient cash to meet its obligations, SunPower had ceased paying its key supplier of solar panels – Maxeon – months prior to July 2023, and Maxeon, in turn, had stopped shipping solar panels to SunPower.

13.    The tumult with Maxeon was hidden from investors until November 15, 2023, when Maxeon revealed that it had discontinued shipments to SunPower in July because of nonpayment of approximately $29 million of invoices – at the same time SunPower had been telling the public that it had enough cash to meet all of its obligations.  When the falsity of that claim was exposed, SunPower's share price dropped from $4.67 to $4.33, or 7.3% on November 16, 2023.

14.    Even still, SunPower continued to mislead investors regarding the true nature of its decline.  As investors would learn later, the Company's public statements concealed that SunPower was desperate for a life line and were intended to foster the impression that the Company was on the brink of recovery.

15.    On February 15, 2024, SunPower announced encouraging and optimistic fourth quarter and full year 2023 financial results and an infusion of additional capital. "For 2024, we are focused on profitability and free cash flow, and

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

we expect to be cash flow positive in the second half of 2024 and beyond," stated Elizibeth Eby, SunPower CFO, regarding the results.

16.    The recent capital raise came from SunPower's largest stockholder, Sol Holding, LLC ("Sol Holding"), who exhibited a robust show of support for the Company:

> On February 14, 2024, the Issuer entered into a second lien credit agreement (the "Second Lien Credit Agreement") with Sol Holding, LLC ("Sol Holding"), pursuant to which Sol Holding provided an approximately $175 million term loan facility comprised of a $125 million tranche that was borrowed on February 14, 2024 (including the cashless roll of $45 million of outstanding revolving loans plus accrued unpaid interest on such loans into Tranche 1 Loans) (the "Tranche 1 Loans"), and a second tranche of up to $50 million of loans (the "Tranche 2 Loans") available to be borrowed upon the satisfaction of certain conditions, including the delivery of a business plan with respect to the use of proceeds of such loans that is satisfactory to the lenders under the Second Lien Credit Agreement.

17.    "With the recent infusion of capital, SunPower is focused on driving positive free cash flow and profitability," said Peter Faricy, then SunPower's CEO. "This is a new opportunity for SunPower to reinforce our strong foundation as we continue to navigate an uncertain market in early 2024. With this funding and industry tailwinds of extended tax credits and lower equipment costs, we believe SunPower is positioned to execute on maximizing the value proposition of solar and storage for our customers."

18.    On a conference call held February 15, 2024, defendants Faricy and Eby made bullish comments about the Company's business. Defendant Eby explicitly stated, in response to a question by an analyst, about the Company's crucial "going concern" status: "[W]hile we are still in discussions with auditors and reviewing financial plans, we do not expect at the moment to have a going concern provision in our 10-K that's coming out."  (A "going concern" warning is issued if there is  substantial doubt about the entity's ability to continue in business for the next 12-month period).

19.     On February 27, 2024, the Company announced the departure of Peter Faricy as CEO, Principle Executive Officer and Director, and the simultaneous appointment of Thomas H. Werner, the Company's Executive Chairman, as Principle Executive Officer -- seemingly closing and then opening a new chapter for SunPower in which more stability and growth would follow. A press release issue that day quoted Mr. Werner as stating, in relevant part:

> We remain committed to putting safety and our employees first, so that we can continue delivering the highest levels of service to our customers and partners. Importantly, we will also continue to build an even stronger operating discipline as we focus on profitability and achieving positive free cash flow. Now, following the Company's recent capital raise, we look forward to getting back to doing what SunPower does best and building an even more sustainable, resilient, and agile business.

20.     The markets responded favorably and major brokerages raised their prices targets for SPWR stock, including Susquehanna and UBS.

21.     On February 29, 2024, SPWR announced that it filed a Form 12b-25 with the Securities and Exchange Commission to provide notice of the delayed filing of its Annual Report on Form 10-K ("Form 10-K") for the fiscal year ended December 31, 2023. SunPower said it required additional time to complete its financial statements included in the Company's Form 10-K. This was purportedly due to the time and effort that was required to complete restatements of the Company's prior period financial statements, which were filed with the SEC on December 18, 2023. Filing a Form 12b-25 would provide the Company with an automatic extension of fifteen additional calendar days to file the Form 10-K, which was due on February 29, 2024. SunPower indicated it expected to file the Form 10-K as soon as practicable.  There was no public sign of further accounting trouble at this time.

22.     More positive news followed on March 14, 2024, as SPWR announced:

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

SunPower Corp. (NASDAQ:SPWR) a leading residential solar technology and energy services provider, today announced the appointment of residential solar and home energy veteran, Tony Garzolini, as Executive Vice President and Chief Revenue Officer (CRO). In this role, Tony will oversee sales, including the Direct, Dealer and New Homes channels, along with pricing and demand generation.

23.     Additionally, on March 19, 2024, The Company filed its definitive Information Statement on Schedule 14C (the "Information Statement") for purposes of Nasdaq Rule 5635(d), approving by written consent the warrant issuance in connection with the Sol Holding financing, and explaining the circumstances of the transaction in detail.   The Information Statement likewise buoyed investor confidence by touting the transaction as a life-line to stave off "imminent insolvency."  Information Statement at pp. 12-13.  The Schedule 14C also created the impression that sufficient reliable financial information has been provided to the Company's financial advisor and its major investors to inspire confidence in its future sound operation, and the veracity of its executives.

24.     Nonetheless, on April 23, 2024, SunPower shockingly and unexpectedly announced a restatement, disclosing that the Company had identified misstatements in its fiscal year 2022 financial results, including the improper capitalization of certain costs and misclassification of certain expenses, resulting in an overstatement of the Company's income from continuing operations *by $15 to $25 million*.  The Company also revealed that its independent auditor had determined that its previously issued audit reports could no longer be relied upon.  Clearly, the Company's Board and executives had concealed major problems in the weeks leading up to this bombshell announcement.

25.     Not surprisingly, SunPower shares meaningfully declined after the disclosure of the restatement from $2.14 the day before the announcement to $1.96.  In connection with the April 23, 2024 news, SPWR stated in an SEC filing:

On April 17, 2024, the Audit Committee (the "Audit Committee") of the Board of Directors of SunPower Corporation (the "Company") determined, based on the recommendation of management, that the Company's (i) audited financial statements included in the Company's Annual Report on Form 10-K/A for the period ended ***January 1, 2023*** filed with the U.S. Securities and Exchange Commission (the "SEC") on December 18, 2023 (the "2022 Form 10-K/A") and (b) unaudited financial statements included in the Company's Quarterly Report on Form 10-Q/A for the quarterly period ended April 2, 2023 (the "Q1 2023 Form 10-Q/A"); Quarterly Report on Form 10-Q/A for the quarterly period ended ***July 2, 2023*** (the "Q2 2023 Form 10-Q/A"); and Quarterly Report on Form 10-Q for the quarterly period ended October 1, 2023 (the "Q3 2023 Form 10-Q"), all subsequently filed with the SEC on December 18, 2023 (collectively, the "Affected Prior Period Financial Statements"), as well as the relevant portions of any communication which describe or are based on such financial statements, should no longer be relied upon. ***The Company plans to restate, as soon as practicable, the Affected Prior Period Financial Statements.***

In connection with the preparation of its financial statements for the fiscal year ended December 31, 2023, the Company identified misstatements in the audited financial statements for the fiscal year ended January 1, 2023, included in the 2022 Form 10-K/A. These misstatements primarily relate to (i) ***the capitalization of certain deferred costs that did not qualify for capitalization,*** (ii) ***the classification of certain sales commissions as cost of revenue rather than sales, general and administrative expense,*** and (iii) certain other individually immaterial adjustments. The Company estimates that the impact of the aforementioned adjustments is a decrease to income (loss) from continuing operations before income taxes and equity in earnings (losses) of unconsolidated investees for the fiscal year ended January 1, 2023, in the range of approximately $15 million to $25 million.

At this time, the Company has not fully completed its review, and the expected financial impact of the errors described above is preliminary and subject to change. The Company cannot provide assurance that other errors will not be identified. (Emphasis added).

Significantly, the Company stated:

In light of the matters described above, the Company's management has concluded
that ***a new material weakness*** exists in the Company's internal control over financial reporting. The Company's remediation plan with respect to such material weakness will be described in more detail in the Company's amended 2022 Form 10-K/A. (Emphasis added).

26.     Thus, the April 23, 2024 material weakness was unrelated to any such issue previously disclosed.

27.     The full extent of SunPower's troubles was still being concealed by Defendants, however.

28.     On May 13, 2024, Defendants issued a Form 12b-25 regarding its inability to file the Company's Q1 2-24 Form 10-Q for the quarterly period ended March 31, 2024 due to the restatement, but reassured investors that the Company was "working diligently and plans to restate the Affected Prior Period Financial Statements and file the 2023 Form 10-K and Q1 2024 Form 10-Q as soon as practicable."  Investors responded favorably to this optimism, driving the stock nearly 60% from the previous close, to $4.39 the following day.

29.     Likewise, on May 20, 2024, Defendants filed a Form 8-K disclosing SunPower's delisting from Nasdaq due to the Company's inability to file the 2023 Form 10-K and Q1 2024 Form 10-Q by the prescribed date, but repeated its reassurance that "[w]hile the Company can provide no assurances as to timing, the Company is working diligently and plans to restate the Affected Prior Period Financial Statements and file the 2023 Form 10-K and Q1 2024 Form 10-Q as soon as possible" to regain compliance with Nasdaq listing rules.

30.     What Defendants did not reveal is that SunPower's situation was much worse than Defendants were letting on, that the Company had been the subject of a concealed SEC investigation *for nearly three months – since February 28, 2024*, that Management and the Audit Committee had withheld disclosure of allegations of wrongdoing by certain current or former members of Management from the Company's outside auditor, Ernst & Young LLP ("E&Y"), that E&Y was on the verge of resigning as auditor as a result paralyzing the Company's efforts to complete the restatement and

jeopardizing further financings, and finally, that the Company was on the verge of collapse.

31.     On June 3, 2024, Defendants portrayed a $50 million draw on the Company's term loan as a very positive development.  In a press release the Company recounted: "Today's announcement demonstrates the continued support of our majority shareholders in the long-term value proposition of residential solar and SunPower's commitment to operating a financially sound business," said Tom Werner, Principal Executive Officer at SunPower. "In addition to this funding, in recent months, we have worked to reduce overall costs and increase the proportion of our costs that vary with changes in volume as we aim to build a more resilient business that can deliver consistent positive free cash flow in the future."

32.     On July 3, 2024, however, Defendants' efforts to cast SunPower as a Company poised for recovery began to crumble.  On that day, in a filing timed after the markets closed and right before the July 4 holiday, the Company revealed that it had been notified by E&Y on June 27, 2024, of its decision to resign as the independent registered public accounting firm of the Company, effective as of that date.  The Company disclosed, among other things, that various allegations against current and former members of management had been withheld from E&Y, leading to a disagreement regarding audit scope and E&Y's decision to resign:

> As a result of EY's resignation, the Company and the Audit Committee have initiated discussions with independent registered public accounting firms to also audit the Company's financial statements for the fiscal year ended December 31, 2023, as well as the Company's restated financial statements included in the 2022 Form 10-K/A (as defined below). EY resigned prior to the completion of the audits for the fiscal year ended December 31, 2023 and the restatement of the fiscal years included in the 2022 Form 10-K/A.
>
> As previously disclosed in the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission (the "SEC") on April 23, 2024, the Audit Committee has previously determined that the Company's (a) audited financial statements included in the Company's Annual Report on Form 10-K/A for the period ended

January 1, 2023 (the "2022 Form 10-K/A"), and (b) unaudited financial statements included in the Company's Quarterly Report on Form 10-Q/A for the quarterly period ended April 2, 2023; Quarterly Report on Form 10-Q/A for the quarterly period ended July 2, 2023; and Quarterly Report on Form 10-Q for the quarterly period ended October 1, 2023 (collectively, and together with the 2022 Form 10-K/A, the "Affected Financial Statements"), should no longer be relied upon and should be restated due to accounting errors in each of the Affected Financial Statements. Similarly, any previously issued or filed reports, press releases, earnings releases, investor presentations or other communications of the Company describing the Company's financial results or other financial information relating to the periods covered by the Affected Financial Statements should no longer be relied upon. In addition, the report of EY on the Company's financial statements and internal control over financial reporting included in the previously filed 2022 Form 10-K/A should no longer be relied upon.

EY's most recent reports on the Company's consolidated financial statements, for the fiscal years ended January 1, 2023 and January 2, 2022, did not contain an adverse opinion or a disclaimer of opinion and were not qualified or modified as to uncertainty, audit scope, or accounting principles, except that EY's audit report on the Company's consolidated financial statements included in the 2022 Form 10-K/A included explanatory paragraphs regarding (i) the Company's ability to continue as a going concern, (ii) the restatement of the Company's consolidated financial statements included in the 2022 Form 10-K/A and (iii) EY's report dated December 18, 2023 noted that they audited the Company's internal control over financial reporting as of January 1, 2023, upon which EY expressed an adverse opinion. During the two most recent fiscal years ended December 31, 2023 and January 1, 2023 and the subsequent interim period preceding EY's resignation, there were no reportable events (as described in Item 304(a)(1)(v) of Regulation S-K under the Securities Exchange Act of 1934, as amended (the "Exchange Act")), except as follows:

1. On April 8, 2024, EY advised the Audit Committee that internal controls necessary to develop reliable financial statements do not exist due to an ineffective control environment.

2. On June 27, 2024, EY advised the Audit Committee that information has come to its attention that has made EY unwilling to be associated with the financial statements prepared by management.

3. In connection with EY and the Company's discussions regarding EY's audits and reviews of the Affected Financial Statements during April 2024 through June 2024, EY advised the Company and Audit Committee of the need to expand significantly the scope of its audit procedures, and that information has come to EY's attention that, if further investigated, may materially impact the fairness or reliability of the Company's financial statements, or cause EY to be

unwilling to rely on management's representations or be associated with the Company's financial statements. Given that the Company's process for addressing the restatements of the Affected Financial Statements and preparing its financial statements for the year ended December 31, 2023, remains open, the expansion of the scope of its audit was not completed prior to EY's resignation.

4.  In connection with EY and the Company's discussions regarding EY's audits and reviews of the financial statements during April 2024 through June 2024, EY advised the Company and Audit Committee that information had come to its attention that materially impacts the fairness or reliability of the Company's financial statements. Given that the Company's process for addressing the restatements of the Affected Financial Statements and preparing its financial statements for the year ended December 31, 2023, remains open, the issues raised were not resolved to EY's satisfaction prior to its resignation.

During the two most recent fiscal years ended December 31, 2023 and January 1, 2023 and the subsequent interim period preceding EY's resignation, there were no disagreements (as described in Item 304(a)(1)(iv) of Regulation S-K under the Exchange Act), except as follows:

***EY believes that allegations of misconduct by senior members of management, who had significant roles in internal control over financial reporting and upon whose representations EY relied, were within the scope of EY's audit. The Audit Committee previously had a good faith understanding that its obligations were limited to reporting to EY allegations of misconduct that bore on the accuracy of the Company's financial statements by senior members of management who had significant roles in internal control over financial reporting and upon whose representations EY relied.*** The allegations that were the subject matter of discussion between EY and the Audit Committee regarding this reporting obligation do not relate to current senior members of management.

The Audit Committee was prepared to provide broader disclosure and was in discussions with EY concerning the scope of the disclosure obligation at the time of EY's resignation. Accordingly, there was a disagreement between the Company and EY regarding this aspect of EY's auditing scope or procedures at the time of EY's resignation. The Audit Committee has discussed the foregoing matters with EY. The Company has authorized EY to respond fully to the inquiries of any successor independent registered public accounting firm concerning the subject matter of the items described herein. The Company will describe any material weaknesses identified and related remedial measures to be taken as required in its Exchange Act filings. In accordance with Item 304(a)(3) of Regulation S-K under the Exchange Act, the Company provided EY with a copy of the statements set forth

in this Item 4.01 prior to the filing of this Current Report on Form 8-K (the "Form 8-K") and requested that EY furnish a letter addressed to the SEC stating whether or not it agrees with the statements made herein and, if not, stating the respects in which it does not agree. EY has not provided its letter as of the time of the filing of the Form 8-K. Accordingly, the Company has requested that EY provide its letter as promptly as possible so that the Company can file the letter with the SEC within ten business days after the date of filing of this Form 8-K. The Company will file such letter by an amendment of this Form 8-K within two business days of receipt. [Emphasis added].

33.     Additionally, the July 3 Form 8-K revealed that the Company had been the subject of an SEC investigation for months, SunPower having received a document subpoena on February 28, 2024, relating to accounting matters, including aspects of the Company's revenue recognition practices.  In connection with the SEC's investigation, the Audit Committee had immediately authorized an internal review conducted by an outside law firm and had sought the assistance of forensic accountant advisors.

34.     On the first trading day after the July 4 holiday, SunPower's stock sunk to $2.08 on this news.

35.     On July 12, 2024, the Company filed as an exhibit to a Form 8-K, E&Y's response, as directed by the SEC.   Notably, E&Y, shed further light on the disagreements relating to the failure by the Company and the Audit Committee to disclose certain allegations against *current* or former members of management (*i.e.*, not only former members, as the Company suggested in its July 3 filing) who had significant roles in internal control over financial reporting and whose representations E&Y relied upon and needed to rely upon:

July 10, 2024

Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549

Ladies and Gentlemen:

We have read Item 4.01 of Form 8-K dated July 3, 2024, of SunPower Corporation (the "Company") and are in agreement with the statements contained in the first through fourth paragraphs, first and second sentences of the seventh paragraph, and first through third sentences of

the eighth paragraph therein, except that we have no basis to agree or disagree with the statements of the registrant regarding the Company's discussions with other independent registered public accounting firms contained in the first paragraph therein. We also have no basis to agree or disagree with the statements of the registrant contained in the third sentence of the seventh paragraph and fourth sentence of the eighth paragraph therein.

***We disagree with the characterization of the disagreement as described by the registrant in the fifth and sixth paragraphs therein. There was a disagreement between EY and the Company regarding audit scope, specifically regarding our expectation that we would be informed of allegations against current or former members of management who have or had significant roles in internal control over financial reporting and whose representations we rely upon, or previously had relied upon, in performing our audits, even if those allegations did not expressly assert that there were errors in the Company's financial statements, and that the evaluation of such allegations was within the scope of our audit procedures. After we became aware that not all such matters had been disclosed to us, we communicated the need for the Company and its Audit Committee to disclose them to EY, and we believed there was agreement on this point. However, the discovery of additional such allegations that had not been disclosed to EY indicated that a disagreement existed regarding our auditing scope or procedures.*** We have no basis to agree or disagree with the statements of the registrant regarding the Audit Committee's previous understanding of its reporting obligations to EY or what disclosure the Audit Committee may have been prepared to provide in the future. Finally, given that discussions regarding the completeness of the disclosures to EY were unresolved as of the date of EY's resignation, we disclaim knowledge of whether there have been allegations against current senior members of management.

/s/ Ernst & Young LLP [Emphasis added]

36.    Even after this disastrous revelation, Defendants maintained the charade that these events were not calamitous and endeavored to reassure investors.  In a press release issued simultaneously with the announced resignation of E&Y on July 3, the Company stated that it was "working to secure a new  independent registered public accounting firm" and that the "development has no material impact on SunPower's current cash position or continued focus on delivering for its customers."

37.    Then, in an industry note shared by Roth Capital Partners, LLC on July 18, 2024, and other industry contacts, it was reported that on July 17, 2024, SunPower had sent a letter to dealers advising that it would no longer be supporting new leases or

power purchase agreements, essentially conceding that SunPower would not be acquiring any new customers, and reflecting doubt as to the Company's ability to continue as a going concern.   The Company also said in a letter to dealers who sell its systems that it could not support installation of panels that had been delivered but not yet installed:

**SUNPOWER®**

Dear Dealer,

Beginning today, July 17, 2024, SunPower will no longer be supporting new Lease and PPA sales nor new project installations of these financing options.  This decision was not made lightly, and we continue to consider options to support our mutual customers and our collective pipeline of business.

As a result, we will deactivate Lease and PPA offerings from EDDiE, cease countersigning new agreements, and all active unsigned proposals will expire. Additionally, all new shipments and project installations will be halted.

We recognize the gravity of this morning's news and the difficult position you may find yourself in. We continue to explore alternative providers to help transfer sold projects and expect more details from SunPower as soon as possible.

We deeply regret any inconvenience or hardship that this news may cause.

Thank you,

38.    On this news, the Company's stock plummeted nearly 75% to $0.68, making it SunPower's stock's worst week on record according to Dow Jones Market Data.  Indeed, the stock fell 40% July 18, 2024 and 55% on July 19, 2024, the close of the Class Period.

39.    On July 22, 2024, it was reported by various news outlets that SunPower was on the cusp of failing and analysts downgraded the Company to underperform and cut their price targets.

40.    "***We think this effectively marks the end for SPWR as an operating business***," said an analyst note from Guggenheim analyst, Joseph Osha. "***Considering***

*the debt that the company has accumulated, we believe that SPWR's equity no longer has any value*." Osha said this decision could mark a "winddown process" for the company, which will likely sell remaining assets and delist its stock. Guggenheim Securities cut SPWR's price target from $1 to zero. Osha called SunPower's downfall a "sad end for an industry pioneer."

41.     Forbes.com summarized SunPower's woes in a July 19, 2024 article entitled, "Dark Days for SunPower, as Shares Plunge Amid Accounting Scandal":

> According to a letter written by EY, filed with the SEC, the auditor quit in part because it felt internal controls and financial reporting disclosures were not to be relied upon in the past, and they're not sure they can be relied upon now.
> The troubles at SunPower must be beyond the average accounting questions facing these companies.
>
> There will naturally be implications. Was Sol Holdings induced to throw good money after bad based on fractured financials? *If you put fresh capital into a company on the promise that its accounting issues were being ironed out, then six months later the auditor quits because management wouldn't cooperate, you might perhaps feel like a victim of securities fraud.* (Emphasis added).

42.     As a result of Defendants' wrongful acts and omissions, and the resulting decline in the market value of SunPower's stock, Plaintiff and the Class (as defined herein) suffered significant losses and damages under the federal securities laws.

## III.     JURISDICTION AND VENUE

43.     The claims asserted arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

44.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Defendant SunPower conducts substantial business in this District, and a significant portion of the damages due to Defendants' misconduct were suffered within this District.

45.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## IV.    PARTIES

### A.     PLAINTIFF

46.     Plaintiff Gabriel Rodrigues, as set forth in his Certification, purchased SunPower common stock during the Class Period and suffered damages due to Defendants' violations of the federal securities laws alleged herein.   Plaintiff is a resident of the State of California, County of Alameda.

### B.     DEFENDANTS

47.     Defendant SunPower is incorporated under the laws of Delaware with principal offices located in Richmond, California.   SunPower's common stock trades on the Nasdaq Global Select Market under the symbol "SPWR."

48.     Defendant Peter Faricy was the Company's Chief Executive Officer during the Class Period until February 26, 2024.   Faricy made and authorized false, misleading and/or omissive statements during the Class Period.   Among other things, Faricy signed internal control and SOX certifications attached to the misleading 2022 Form 10-K/A, Q1 2023 Form 10-Q/A, Q2 2023 Form 10-Q/A and Q3 2023 Form 10-Q.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

49.     Defendant Thomas Werner has been the Company's Principal Executive Officer since February 19, 2024.  Werner made and authorized false, misleading and/or omissive statements during the Class Period.   During Werner's prior stint as CEO, allegations of accounting manipulation and securities fraud were upheld against him in *In re Sunpower Sec. Litig.,* No. C 09-5473 RS, 2011 U.S. Dist. LEXIS 152920 (N.D. Cal. Dec. 19, 2011).

50.     Defendant Elizabeth Eby has served as the Company's Chief Financial Officer since May 30, 2023.  Eby made and authorized false, misleading and/or omissive statements during the Class Period.   Among other things, Eby signed the misleading 2022 Form 10-K/A, Q1 2023 Form 10-Q/A, Q2 2023 Form 10-Q/A and Q3 2023 Form 10-Q.

51.     Defendants Faricy, Werner and Eby are sometimes referred to herein as the "Individual Defendants."

52.     Each of the Individual Defendants:

(a) Directly participated in the management of SunPower;

(b) Was directly involved in the day-to-day operations of SunPower at the highest levels;

(c) Was privy to confidential proprietary information concerning SunPower and its business and operations;

(d) Was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) Was directly or indirectly involved in the oversight or implementation of SunPower's internal controls;

(f) Was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning SunPower; and/or

(g) Approved or ratified these statements in violation of the federal securities laws.

53.    SunPower is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondent superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

54.    The scienter of the Individual Defendants and other employees and agents of SunPower is similarly imputed to SunPower under *respondeat superior* and agency principles.

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

### A. SUNPOWER MISLEADS INVESTORS ABOUT ITS BREACHES OF FINANCIAL COVENANTS

55.    Although they existed at the time, SunPower did not mention any serious issues with its accounting or financial reports when it filed its quarterly reports on May 3, 2023 (the beginning of the Class Period) and August 2, 2023. These issues were concealed.  But after hours on October 24, 2023, SunPower filed a Form 8-K announcing that the financial statements in the Company's FY 2022 Form 10-K and its Q1 2023 and Q2 2023 Form10-Qs should no longer be relied upon, and that it planned to restate its financials for those periods in amended reports. The Company described an overstatement of consignment inventory of microinverter components at certain third-party locations, a material weakness in the Company's internal controls over financial reporting, and ineffective disclosure controls and procedures.

56.     SunPower added one more sentence at the end of its statement:

The Company and Bank of America, N.A., the administrative agent and collateral agent for the lenders (the 'Agent') under the Credit Agreement dated as of September 12, 2022 (as amended by the First Amendment, dated as of January 26, 2023, the 'Credit Agreement'), among the Company, the lenders party thereto from time to time, and the Agent are currently negotiating the terms and conditions of consent and waiver to address the effects of the Restatement under the Credit Agreement.

57.     Defendants did not offer an explanation as to what was meant by "the effects of the Restatement under the Credit Agreement."

58.     On November 1, 2023, SunPower reported its preliminary Q3 2023 financial results. Those preliminary results made clear that even the Company's reduced full-year 2023 guidance was no longer feasible, and SunPower revised it downward again. SunPower guided an adjusted EBITDA loss of ($35) million to ($25) million based on 70,000 to 80,000 new customers, and adjusted EBITDA per customer of only $600 to $700. It also projected a net GAAP loss of ($175) million to ($165) million.

59.     The Company held an earnings call that same day, where Peter Faricy, Elizabeth Eby, and investor relations Vice President Michael Weinstein spoke on the Company's behalf.

60.     Investors were understandably concerned about whether the Company's revised figures placed it in breach of its crucial financial covenants in its lending agreements. Accordingly, a Goldman Sachs analyst directly asked Eby about SunPower's present compliance with its financial covenants:

Question – Brian Lee: I know, Beth, you're still working with your creditors on the waivers and what have you, but could you remind us what the actual covenants are? I believe there might be some either

minimum cash and/or EBITDA coverage covenants. Could you remind us what those are, where you stand relative to those today?

Answer – Elizabeth Eby: So, the covenant – there is four covenants. One is a net debt-to-EBITDA with all the adjustments of 4.5x, and that's all the non-recourse. If you take out the non-recourse groups, there's a interest coverage and there's a minimum liquidity, not minimum cash, and an asset covenant.

Question – Brian Lee: Okay. And...

Answer – Elizabeth Eby: And we reached on all of those.

Question – Brian Lee: Yes. And given the...

Answer – Elizabeth Eby: Well, pending final adjustments. But yes.

Question – Brian Lee: Understood. Sorry, I cut you off there. So it sounds like even given the negative EBITDA outlook here that you updated the market on this morning, you still plan to be in compliance with all those covenants through year-end?

Answer – Elizabeth Eby: We need to get to the final phase of they're always the backward looking and we're fine in Q3 and we're talking to the banks about waivers for the restatement and anything else we need.

Question – Brian Lee: Okay.  Understood.  Helpful.

61.     Contrary to Eby's statement during the earnings call, the Company was in fact already in violation of its financial covenants during Q3 2023, and so as of the date of that call was already at risk of its lenders demanding immediate repayment, triggering bankruptcy or other serious consequences. Accordingly, Eby blatantly misled investors.

62.     Eby was aware of SunPower's precarious financial position when she spoke on the November 1, 2023, earnings call. She either knew for a fact that the Company was not "fine" with its financial covenants in Q3 2023, or she was severely

reckless in stating definitively that the Company was "fine" in Q3 2023 if she did not have the numbers to answer the question one way or another. Eby certainly understood that the Company's non-compliance with its financial covenants, and its attendant risk of bankruptcy or other material negative consequences, was material to investors.

63.     SunPower was due to file its Q3 2023 Form 10-Q by no later than November 29, 2023, but on November 13, 2023, SunPower announced that it would not be able to timely file its Q3 2023 Form 10-Q. SunPower explained that it was "working diligently to complete the Restatement," but that to file its Q3 financials by the prescribed due date would require "unreasonable effort or expense."

64.     After trading hours on December 11, 2023, SunPower shocked investors when it filed a Form 8-K announcing that it had entered into an agreement with Bank of America related to breaches of covenants contained in the Credit Agreement. In this release, Defendants admitted that SunPower had breached some covenants and was anticipating breaching others, without specifying which were which. In pertinent part, in discussing the agreement reached with Bank of America, the Form 8-K stated:

> The Amendment provides for, among other things . . . a temporary waiver until January 19, 2024 . . . of existing and certain anticipated defaults and events of default under the Credit Agreement related to the breach of a financial covenant and a reporting covenant….

65.     On this news, share prices of SunPower dropped $.37 per share, or 7.7%, from the closing price of $4.80 per share on December 11, 2023, to the close price of $4.43 per share on December 12, 2023.

66.     Then, in the morning on December 18, 2023, SunPower filed its financials for Q3 2023, along with restated financials for fiscal year 2022 and the first two quarters of 2023.

69.   SEC S-K Item 2.04 ("Triggering Events That Accelerate or Increase a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement") required that Defendants disclose the breach of SunPower's financial covenant. As SunPower admitted, it breached its financial covenants as of October 1, 2023, which accelerated its credit obligations. Defendants violated S-K Item 2.04 by failing to disclose this breach until over two months after it happened. Defendants' misstatements were all the more misleading in this context. This would not be the last time SunPower and its executives concealed negative internal events, only to reveal them later when concealment was no longer possible.

70.   On the news of the Company's announcement of the breach of financial covenants, restatement, and a going concern warning, share prices of SunPower plummeted another $1.92 per share, or over 31%, from the closing price of $6.14 per share on December 15, 2023, to the close price of $4.22 per share on December 18, 2023, damaging investors.

71.   On February 15, 2024, SunPower filed a Form 8-K announcing that it had obtained permanent waivers of its defaults under both the Credit Agreement and the Atlas Credit Agreement. The Company also announced amendments rendering the financial covenants under the Credit Agreement less onerous. The Company went on to state that it had obtained $175 million of capital and $25 million of additional revolving debt capacity from Sol Holding.

72.   Yet to obtain this additional financing, the Company was forced to issue penny warrants to Sol Holding to purchase up to approximately 41.8 million shares of the Company's common stock with an additional 33.4 million of warrants issued if the Company drew the full amount of available funding, significantly diluting existing shareholder value.

73.     The next week, on February 23, 2024, SunPower announced that it had secured over $300 million in project financing commitments for its residential solar and storage lease programs, enabling it to meet certain funding conditions in its loans from Sol Holding.

74.     On this news, share prices of SunPower fell $1.08 per share, or 25.4%, from the closing price of $4.26 per share on February 14, 2024, to the closing price of $3.18 per share on February 23, 2024.  To market investors, however, it seemed at that point that the worst was over.  It was not.  More unexpected adverse revelations were in store for them.

**B.  SUNPOWER MISLEADS INVESTORS ABOUT ITS CASH POSITION**

75.     While Defendants Eby and Faricy were misleading investors about SunPower's breach of financial covenants, the Company was also actively concealing a dire cash shortage by misrepresenting that it had sufficient cash to cover its obligations in the coming year, when in fact it appears to have been unable to pay its current debts.

76.     Defendants Eby and Faricy did not mention this when they filed SunPower's Q1 and Q2 2023 Forms 10-Q on May 3, 2023 and August 2, 2023, respectively.

77.     Instead, SunPower took the opportunity in each of these filings to reassure investors regarding its cash position, claiming, "We currently anticipate that our cash and cash equivalents will be sufficient to meet our obligations over the next 12 months from the date of issuance of our financial statements." Those statements were false when they were made. SunPower's cash position became so strapped that it had already stopped paying Maxeon, one of its key suppliers.

78.     Then, on November 15, 2023, SunPower and Maxeon, the primary supplier of SunPower's photovoltaic modules, both released press releases

announcing that they had entered into an agreement to settle and resolve disputes related to their contract. Maxeon stated that it had suspended shipments to SunPower in July 2023 because SunPower had seriously fallen behind on payments—SunPower had failed to pay approximately $29 million of past due invoices. Accordingly, SunPower had been unable to pay its invoices to its key supplier for months prior to July 2023, and thus misled investors when it stated in its May and August 2023 quarterly reports that it anticipated that it had sufficient cash and cash equivalents to meet its obligations over the next 12 months.

79.     On this news, share prices of SunPower dropped $.34 per share, or 7.3%, from the closing price of $4.67 per share on November 15, 2023, to the close price of $4.33 per share on November 16, 2023.

### C. SUNPOWER MISLEADS INVESTORS REGARDING THE SUFFICIENCY OF THE COMPANY'S INTERNAL CONTROLS AND CONCEAL AN SEC INVESTIGATION

80.     In February 2024, Defendants were withholding from investors SunPower's truly dire situation, maintaining a tone of optimism and reassuring investors that the problems it had faced since the restatement were well in hand and SunPower was poised for a strong recovery.

81.     On February 15, 2024, SunPower announced encouraging and optimistic fourth quarter and full year 2023 financial results and an infusion of additional capital.  The press release touted:

**SunPower Reports Fourth Quarter and Full Year 2023 Results**

- *Added 16,000 customers in Q4, 75,900 new customers in FY 2023*
- *Reported Q4 revenue of $357 million; FY 2023 revenue of $1.7 billion*
- *Reported Q4 GAAP Net Loss of ($124) million and Adjusted EBITDA of ($68) million; FY 2023 GAAP Net Loss of ($247) million and Adjusted EBITDA of ($84) million*
- *Announced $175 million of additional capital and $25 million of additional revolving debt capacity*

82.     The FY 2024 Guidance also bespoke optimism and did not hint at any further accounting issues:

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

| FY 2024 GUIDANCE | |
| --- | --- |
| Net Loss (GAAP) | ($160) million - ($80) million |
| Gross Margin (Non-GAAP) | 17% - 19% |
| Free Cash Flow[1] | Positive in second half 2024 |

83.   "For 2024, we are focused on profitability and free cash flow, and we expect to be cash flow positive in the second half of 2024 and beyond," stated, Defendant Eby, SunPower CFO, regarding the results. The company further announced a significant infusion of capital.

84.   In the February 15, 2024 press release attached as Exhibit 99.1 to the Form 8-K filed that day, Defendant Faricy lauded the recent capital raise: "With the recent infusion of capital, SunPower is focused on driving positive free cash flow and profitability." "This is a new opportunity for SunPower to reinforce our strong foundation as we continue to navigate an uncertain market in early 2024. With this funding and industry tailwinds of extended tax credits and lower equipment costs, we believe SunPower is positioned to execute on maximizing the value proposition of solar and storage for our customers."

85.   The recent capital raise referenced came from SPWR's largest stockholder, who exhibited  a robust show of support.  On February 15, 2024, a separate SEC filing by SPWR revealed:

> On February 14, 2024, the Issuer entered into a second lien credit agreement (the "Second Lien Credit Agreement") with Sol Holding, LLC ("Sol Holding"), pursuant to which Sol Holding provided an approximately $175 million term loan facility comprised of a $125 million tranche that was borrowed on February 14, 2024 (including the cashless roll of $45 million of outstanding revolving loans plus accrued unpaid interest on such loans into Tranche 1 Loans) (the "Tranche 1 Loans"), and a second tranche of up to $50 million of loans (the "Tranche 2 Loans") available to be borrowed upon the satisfaction of

certain conditions, including the delivery of a business plan with respect to the use of proceeds of such loans that is satisfactory to the lenders under the Second Lien Credit Agreement.

86.    Then-CEO Peter Faricy emphasized: "With this infusion of extra liquidity and working cash-flow to our monetary record, combined with significant expense decreases, SunPower is finding sure ways to situate itself to prevail in 2024 and then some."  Soon, major brokerages raised their prices targets for SunPower stock, including Susquehanna and UBS

87.    On February 29, 2024, shortly after Werner's February 27 elevation, SPWR announced that it filed a Form 12b-25 with the Securities and Exchange Commission to provide notice of the delayed filing of its Annual Report on Form 10-K for the fiscal year ended December 31, 2023. SunPower required additional time to complete its financial statements included in the Company's Form 10-K. This was purportedly due to the time and effort that was required to complete restatements of the Company's prior period financial statements, which were filed with the SEC on December 18, 2023.  Filing a Form 12b-25 would provide the Company with an automatic extension of fifteen additional calendar days to file the Form 10-K, which was due on February 29, 2024. SunPower claimed it expected to file the Form 10-K as soon as practicable.  There was no public sign of further accounting trouble at this time

88.    More positive news followed on March 14, 2024, as SPWR announced:

SunPower Corp. (NASDAQ:SPWR) a leading residential solar technology and energy services provider, today announced the appointment of residential solar and home energy veteran, Tony Garzolini, as Executive Vice President and Chief Revenue Officer (CRO). In this role, Tony will oversee sales, including the Direct, Dealer and New Homes channels, along with pricing and demand generation.

*"SunPower made great strides to improve our financial footing and we remain laser focused on achieving profitability and cash flow*

*generation.* As a part of this imperative, we're pleased to welcome Tony back to SunPower as our first Chief Revenue Officer," said Tom Werner, Executive Chairman of the Board and Principal Executive Officer of SunPower. "With Tony's deep expertise in residential renewable energy and exceptional track record working with our valued network of independent solar dealers, we believe his leadership will help put SunPower in a strong position to nurture the Dealer Network and expand its reach, further our market leading position in New Homes, and dramatically improve the customer experience. (Emphasis added).

89.    Notably, there was no indication that any negative financial news was forthcoming.

90.    On March 19, 2024, The Company filed its definitive Information Statement on Schedule 14C for purposes of Nasdaq Rule 5635(d), approving by written consent the warrant issuance in connection with the Sol Holding financing. The Information Statement characterized the transaction as a life-line to stave off "imminent insolvency." Information Statement at pp. 12-13. According to the Information Statement, on January 6, 2024, the Company engaged Houlihan for the purpose of rendering a written opinion as to whether the Sol Holding financing transaction was fair to SunPower's stockholders from a financial point of view.

91.    According to the Information Statement, "[n]othing came to Houlihan's attention in the course of this engagement which would lead it to believe that (i) any information provided to Houlihan or assumptions made by Houlihan were insufficient or inaccurate in any material respect or (ii) it was unreasonable for Houlihan to use and rely upon such information or make such assumptions." In other words, neither Management, nor the unnamed members of the Special Committee[1] which surely included members of the Audit Committee, apprised

---

[1] The Information Statement references the formation of the Special Committee on January 12, 2024 to "among other things, review, investigate, consider, evaluate and negotiate and determine the terms of any financing proposal received by the Company." Information Statement at p. 6. It does not identify the members of the

Houlihan of any inquiries, investigations, or ongoing concerns regarding the accuracy of 2022 financials.

92.     On March 21, 2024, the Company filed a Form 8-K revealing that it had received a standard notice from Nasdaq indicating that as a result of the Company not having timely filed the Form 10-K with the SEC, SunPower was not incompliance with the exchange's listing rules and must submit a plan to regain compliance with the listing rules.  The, Form 8-K, signed by Defendant Eby, stated that "[w]hile the Company can provide no assurances as to timing, the Company is working diligently to finalize the Form 10-K and plans to file the Form 10-K as soon as practicable, including to regain compliance with the Listing Rule." This statement was omissive and misleading.

93.     On April 23, 2024, SunPower shockingly and unexpectedly announced a restatement, disclosing that the Company had identified misstatements in its fiscal year 2022 financial results, including the improper capitalization of certain costs and misclassification of certain expenses, resulting in an overstatement of the Company's income from continuing operations *by $15 to $25 million*.  The Company also revealed that its independent auditor had determined that its previously issued audit reports could no longer be relied upon.  Clearly, the Company's Board and executives had concealed major problems in the weeks leading up to this bombshell announcement.

94.     Not surprisingly, SunPower shares meaningfully declined after the disclosure of the restatement from $2.14 the day before the announcement to $1.96.  In connection with the April 23, 2024 news, SPWR stated in an SEC filing:

---

Special Committee, merely averring that it "consist[s] solely of independent and disinterested directors who are not affiliated with Sol Holding, LLC or its affiliates." *Id.*

On April 17, 2024, the Audit Committee (the "Audit Committee") of the Board of Directors of SunPower Corporation (the "Company") determined, based on the recommendation of management, that the Company's (i) audited financial statements included in the Company's Annual Report on Form 10-K/A for the period ended ***January 1, 2023*** filed with the U.S. Securities and Exchange Commission (the "SEC") on December 18, 2023 (the "2022 Form 10-K/A") and (b) unaudited financial statements included in the Company's Quarterly Report on Form 10-Q/A for the quarterly period ended April 2, 2023 (the "Q1 2023 Form 10-Q/A"); Quarterly Report on Form 10-Q/A for the quarterly period ended ***July 2, 2023*** (the "Q2 2023 Form 10-Q/A"); and Quarterly Report on Form 10-Q for the quarterly period ended October 1, 2023 (the "Q3 2023 Form 10-Q"), all subsequently filed with the SEC on December 18, 2023 (collectively, the "Affected Prior Period Financial Statements"), as well as the relevant portions of any communication which describe or are based on such financial statements, should no longer be relied upon. ***The Company plans to restate, as soon as practicable, the Affected Prior Period Financial Statements.***

In connection with the preparation of its financial statements for the fiscal year ended December 31, 2023, the Company identified misstatements in the audited financial statements for the fiscal year ended January 1, 2023, included in the 2022 Form 10-K/A. These misstatements primarily relate to (i) ***the capitalization of certain deferred costs that did not qualify for capitalization,*** (ii) ***the classification of certain sales commissions as cost of revenue rather than sales, general and administrative expense***, and (iii) certain other individually immaterial adjustments. The Company estimates that the impact of the aforementioned adjustments is a decrease to income (loss) from continuing operations before income taxes and equity in earnings (losses) of unconsolidated investees for the fiscal year ended January 1, 2023, in the range of approximately $15 million to $25 million.

At this time, the Company has not fully completed its review, and the expected financial impact of the errors described above is preliminary and subject to change. The Company cannot provide assurance that other errors will not be identified. (Emphasis added).

95.     Significantly, the Company stated:

In light of the matters described above, the Company's management has concluded

that ***a new material weakness*** exists in the Company's internal control over financial reporting. The Company's remediation plan with respect to such material weakness will be described in more detail in the Company's amended 2022 Form 10-K/A. (Emphasis added).

96.     Thus, the April 23, 2024 material weakness was unrelated to any such issue previously disclosed.

97.     In addition, and very germane to the issues presented herein, SunPower, in order to obtain the February 14, 2024 Sol Holding Financing agreement, covenanted as follows in Section 5.05 at pp. 64-65 (emphasis added):[2]

(a)  ***The audited consolidated balance sheet of the Borrower and its consolidated Subsidiaries for the fiscal year ended January 1, 2023***, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal year of the Borrower and its consolidated Subsidiaries, including the notes thereto, (i) ***were prepared in accordance with GAAP*** consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; (ii) fairly present the financial condition of the Borrower and its consolidated Subsidiaries as of the date thereof and their results of operations, cash flows and changes in shareholders' equity for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (iii) show all material indebtedness and other liabilities, direct or contingent, of the Borrower and its consolidated Subsidiaries as of the date thereof, including liabilities for Taxes, material commitments and Indebtedness.

(b)  ***The unaudited consolidated balance sheet of the Borrower and its consolidated Subsidiaries dated July 2, 2023***, and the related consolidated statements of income or operations, shareholders' equity and cash flows for the fiscal quarter ended on that date (i) ***were prepared in accordance with GAAP consistently applied throughout the period covered thereby***, except as otherwise expressly noted therein, and (ii) fairly present the financial condition of the Borrower and its consolidated Subsidiaries as of the date thereof and their results of operations, cash flows and changes in shareholders' equity for the period covered thereby,

---

[2] https://www.sec.gov/ix?doc=/Archives/edgar/data/0000867773/000086777324000015/spwr-20240214.htm

subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments.

(c) The projected consolidated balance sheets, statements of operations and cash flows for the Borrower and its Restricted Subsidiaries and any other projections and budget that have been delivered to the Administrative Agent were prepared by the Borrower in good faith and were based on assumptions that the Borrower believed were reasonable when made, it being understood, that actual results during the periods covered thereby may differ from the projected results.

(d) Since **the Closing Date, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect.**

(e) Neither the Borrower nor any of its Restricted Subsidiaries has, on the Closing Date, any contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments in each case that are material and would need to be disclosed on financial statements in accordance with GAAP, except (i) as referred to or reflected or provided for in the financial statements described in this Section 5.05, (ii) as set forth in Schedule 5.05, or (iii) as otherwise permitted pursuant to this Agreement.

98.     Contrary to the aforementioned covenants that SunPower's financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), the Company had employed qualitative accounting practices inconsistent with GAAP, requiring the restatement. Indeed, adhering to GAAP ensures that financial information is consistently and accurately reported and SunPower has failed miserably in this regard.

99.     ***Thus, the Company issued assurances in connection with the huge Sol Holdings financing as to the January 1, 2023 financials and the July 2, 2023 financials that were simply untrue.*** To put a fine point on the matter, while

Management and the Special Committee were meeting on a near daily basis during January and February 2024 to close the financing transaction with Sol Holding, the Company was simultaneously in the midst of preparing of its financial statements for the fiscal year ended December 31, 2023 during which time, unbeknownst to SunPower's investors,  it had identified misstatements and material deficiencies in the Company's disclosure controls and internal controls over financial reporting.  It was also dealing with an undisclosed SEC investigation.

100.    These revelations came after repeated reassurances that all that was needed to file a valid and reliable Form 10-K and other filings was a bit more time, and that prior issues had been put to bed.  And yet, Defendants were plainly aware of new issues, were working on these issues, and knew that they would very likely not be able to file the required reports, despite their indications otherwise.  This knowledge could not have dawned on them suddenly but likely was known many weeks earlier than revealed.

101.    The full extent of SunPower's troubles was still being concealed by Defendants, however.

102.    On May 13, 2024, Defendants issued a Form 12b-25 regarding its inability to file the Company's Q1 2-24 Form 10-Q for the quarterly period ended March 31, 2024 due to the restatement, but reassured investors that the Company was "working diligently and plans to restate the Affected Prior Period Financial Statements and file the 2023 Form 10-K and Q1 2024 Form 10-Q as soon as practicable."  Investors responded favorably to this optimism, driving the stock nearly 60% from the previous close, to $4.39 the following day.

103.    Likewise, on May 20, 2024, Defendants filed a Form 8-K disclosing SunPower's delisting from Nasdaq due to the Company's inability to file the 2023 Form 10-K and Q1 2024 Form 10-Q by the prescribed date and repeated its reassurance that

"[w]hile the Company can provide no assurances as to timing, the Company is working diligently and plans to restate the Affected Prior Period Financial Statements and file the 2023 Form 10-K and Q1 2024 Form 10-Q as soon as possible" to regain compliance with Nasdaq listing rules.

104.   What Defendants did not reveal is that SunPower's situation was much worse than Defendants were letting on, that the Company had been the subject of an SEC investigation **for nearly three months – since February 28, 2024**, that Management and the Audit Committee had withheld disclosure of allegations of wrongdoing by certain current or former members of Management from the Company's outside auditor, Ernst & Young LLP ("E&Y"), that E&Y was on the verge of resigning as auditor as a result paralyzing the Company's efforts to complete the restatement, and finally, that the Company was on the verge of collapse.

105.   On July 3, 2024, however, Defendants' efforts to cast SunPower as a Company poised for recovery began to crumble.  On that day, in a filing timed after the markets closed and right before the July 4 holiday, the Company revealed that it had been notified by E&Y on June 27, 2024, of its decision to resign as the independent registered public accounting firm of the Company, effective as of that date:

> On June 27, 2024, SunPower Corporation (the "Company") was notified by the Company's independent registered public accounting firm, Ernst & Young LLP ("EY"), of its decision to resign as independent registered public accounting firm of the Company, effective as of that date. Neither the Board of Directors of the Company (the "Board") nor the Audit Committee of the Board (the "Audit Committee") recommended or approved EY's resignation. Prior to EY's resignation, the Company and the Audit Committee had been in discussions with independent registered public accounting firms to audit the Company's fiscal year 2024 financial statements due to the fact that EY would no longer be independent from the Company after the consummation of the acquisition of Global Infrastructure Partners, a member of Sol Holding, LLC, which beneficially owns approximately 65% of the Company's common stock, by BlackRock, Inc., which acquisition is expected to close in the third quarter of 2024, subject to customary regulatory approvals and other closing conditions. As a result of EY's resignation, the Company and the Audit Committee have initiated discussions with independent registered public

accounting firms to also audit the Company's financial statements for the fiscal year ended December 31, 2023, as well as the Company's restated financial statements included in the 2022 Form 10-K/A (as defined below). EY resigned prior to the completion of the audits for the fiscal year ended December 31, 2023 and the restatement of the fiscal years included in the 2022 Form 10-K/A.

As previously disclosed in the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission (the "SEC") on April 23, 2024, the Audit Committee has previously determined that the Company's (a) audited financial statements included in the Company's Annual Report on Form 10-K/A for the period ended January 1, 2023 (the "2022 Form 10-K/A"), and (b) unaudited financial statements included in the Company's Quarterly Report on Form 10-Q/A for the quarterly period ended April 2, 2023; Quarterly Report on Form 10-Q/A for the quarterly period ended July 2, 2023; and Quarterly Report on Form 10-Q for the quarterly period ended October 1, 2023 (collectively, and together with the 2022 Form 10-K/A, the "Affected Financial Statements"), should no longer be relied upon and should be restated due to accounting errors in each of the Affected Financial Statements. Similarly, any previously issued or filed reports, press releases, earnings releases, investor presentations or other communications of the Company describing the Company's financial results or other financial information relating to the periods covered by the Affected Financial Statements should no longer be relied upon. In addition, the report of EY on the Company's financial statements and internal control over financial reporting included in the previously filed 2022 Form 10-K/A should no longer be relied upon.

EY's most recent reports on the Company's consolidated financial statements, for the fiscal years ended January 1, 2023 and January 2, 2022, did not contain an adverse opinion or a disclaimer of opinion and were not qualified or modified as to uncertainty, audit scope, or accounting principles, except that EY's audit report on the Company's consolidated financial statements included in the 2022 Form 10-K/A included explanatory paragraphs regarding (i) the Company's ability to continue as a going concern, (ii) the restatement of the Company's consolidated financial statements included in the 2022 Form 10-K/A and (iii) EY's report dated December 18, 2023 noted that they audited the Company's internal control over financial reporting as of January 1, 2023, upon which EY expressed an adverse opinion. During the two most recent fiscal years ended December 31, 2023 and January 1, 2023 and the subsequent interim period preceding EY's resignation, there were no reportable events (as described in Item 304(a)(1)(v) of Regulation S-K under the Securities Exchange Act of 1934, as amended (the "Exchange Act")), except as follows:

1. On April 8, 2024, EY advised the Audit Committee that internal controls necessary to develop reliable financial statements do not exist due to an ineffective control environment.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

2. On June 27, 2024, EY advised the Audit Committee that information has come to its attention that has made EY unwilling to be associated with the financial statements prepared by management.

3. In connection with EY and the Company's discussions regarding EY's audits and reviews of the Affected Financial Statements during April 2024 through June 2024, EY advised the Company and Audit Committee of the need to expand significantly the scope of its audit procedures, and that information has come to EY's attention that, if further investigated, may materially impact the fairness or reliability of the Company's financial statements, or cause EY to be unwilling to rely on management's representations or be associated with the Company's financial statements. Given that the Company's process for addressing the restatements of the Affected Financial Statements and preparing its financial statements for the year ended December 31, 2023, remains open, the expansion of the scope of its audit was not completed prior to EY's resignation.

4. In connection with EY and the Company's discussions regarding EY's audits and reviews of the financial statements during April 2024 through June 2024, EY advised the Company and Audit Committee that information had come to its attention that materially impacts the fairness or reliability of the Company's financial statements. Given that the Company's process for addressing the restatements of the Affected Financial Statements and preparing its financial statements for the year ended December 31, 2023, remains open, the issues raised were not resolved to EY's satisfaction prior to its resignation.

During the two most recent fiscal years ended December 31, 2023 and January 1, 2023 and the subsequent interim period preceding EY's resignation, there were no disagreements (as described in Item 304(a)(1)(iv) of Regulation S-K under the Exchange Act), except as follows:

EY believes that allegations of misconduct by senior members of management, who had significant roles in internal control over financial reporting and upon whose representations EY relied, were within the scope of EY's audit. The Audit Committee previously had a good faith understanding that its obligations were limited to reporting to EY allegations of misconduct that bore on the accuracy of the Company's financial statements by senior members of management who had significant roles in internal control over financial reporting and upon whose representations EY relied. The allegations that were the subject matter of discussion between EY and the Audit Committee regarding this reporting obligation do not relate to current senior members of management.

The Audit Committee was prepared to provide broader disclosure and was in discussions with EY concerning the scope of the disclosure obligation at the time of EY's resignation. Accordingly, there was a disagreement between the Company and EY regarding this aspect of EY's auditing scope or procedures at the time of EY's resignation. The Audit Committee has discussed the foregoing matters with EY. The Company has authorized EY to respond fully to the inquiries of any successor independent registered public accounting firm concerning the subject matter of the items described herein. The Company will describe any material weaknesses identified and related remedial measures to be taken as required in its Exchange Act filings.

In accordance with Item 304(a)(3) of Regulation S-K under the Exchange Act, the Company provided EY with a copy of the statements set forth in this Item 4.01 prior to the filing of this Current Report on Form 8-K (the "Form 8-K") and requested that EY furnish a letter addressed to the SEC stating whether or not it agrees with the statements made herein and, if not, stating the respects in which it does not agree. EY has not provided its letter as of the time of the filing of the Form 8-K. Accordingly, the Company has requested that EY provide its letter as promptly as possible so that the Company can file the letter with the SEC within ten business days after the date of filing of this Form 8-K. The Company will file such letter by an amendment of this Form 8-K within two business days of receipt.

106.    Additionally, the July 3 Form 8-K revealed that the Company had been the subject of an SEC investigation for months, having received a document subpoena on February 28, 2024, relating to accounting matters, including aspects of the Company's revenue recognition practices. The SEC's inquiry extended through the fourth quarter of 2023.    In connection with the SEC's investigation, the Audit Committee had immediately authorized an internal review conducted by an outside law firm and had sought the assistance of forensic accountant advisors.  Defendants had wrongfully concealed from the public for *months* the existence of the material SEC subpoena and the forensic accounting and legal investigation.

107.    On the first trading day after the July 4 holiday, SunPower's stock sunk to $2.08 on this news.

108.    On July 12, 2024, the Company filed as an exhibit to a Form 8-K, E&Y's response, as directed by the SEC.   Notably, E&Y, shed further light on the disagreements relating to the failure by the Company and the Audit Committee to

disclose certain allegations against current or former members of management who had significant roles in internal control over financial reporting and whose representations E&Y relied upon:

July 10, 2024

Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549

Ladies and Gentlemen:

We have read Item 4.01 of Form 8-K dated July 3, 2024, of SunPower Corporation (the "Company") and are in agreement with the statements contained in the first through fourth paragraphs, first and second sentences of the seventh paragraph, and first through third sentences of the eighth paragraph therein, except that we have no basis to agree or disagree with the statements of the registrant regarding the Company's discussions with other independent registered public accounting firms contained in the first paragraph therein. We also have no basis to agree or disagree with the statements of the registrant contained in the third sentence of the seventh paragraph and fourth sentence of the eighth paragraph therein.

***We disagree with the characterization of the disagreement as described by the registrant in the fifth and sixth paragraphs therein. There was a disagreement between EY and the Company regarding audit scope, specifically regarding our expectation that we would be informed of allegations against current or former members of management who have or had significant roles in internal control over financial reporting and whose representations we rely upon, or previously had relied upon, in performing our audits, even if those allegations did not expressly assert that there were errors in the Company's financial statements, and that the evaluation of such allegations was within the scope of our audit procedures. After we became aware that not all such matters had been disclosed to us, we communicated the need for the Company and its Audit Committee to disclose them to EY, and we believed there was agreement on this point. However, the discovery of additional such allegations that had not been disclosed to EY indicated that a disagreement existed regarding our auditing scope or procedures.*** We have no basis to agree or disagree with the statements of the registrant regarding the Audit Committee's previous understanding of its reporting obligations to EY or what disclosure the Audit Committee may have been prepared to provide in the future. Finally, given that discussions regarding the completeness of the disclosures to EY were unresolved as of the date of EY's resignation, we disclaim knowledge of whether there have been allegations against current senior members of management.

/s/ Ernst & Young LLP [Emphasis added]

39

109. Even after this disastrous revelation, Defendants maintained the charade that these events were not calamitous and endeavored to reassure investors. In a press release issued simultaneously with the announced resignation of E&Y on July 3, the Company stated that it was "working to secure a new independent registered public accounting firm" and that the "development has no material impact on SunPower's current cash position or continued focus on delivering for its customers."

## VI.   THE TRUTH IS REVEALED

110. The full truth was fully revealed on July 18, 2024. In an industry note shared by Roth Capital Partners, LLC on July 18, 2024, and other industry contacts, Defendants' efforts to conceal the true extent of SunPower's deteriorating business unraveled, and it was reported that on July 17, 2024, SunPower had sent a letter to dealers advising that it would no longer be supporting new leases or power purchase agreements, essentially conceding that SunPower would not be acquiring any new customers. The Company also said in a letter to dealers who sell its systems that it could not support installation of panels that had been delivered but not yet installed:

SUNPOWER®

Dear Dealer,

Beginning today, July 17, 2024, SunPower will no longer be supporting new Lease and PPA sales nor new project installations of these financing options. This decision was not made lightly, and we continue to consider options to support our mutual customers and our collective pipeline of business.

As a result, we will deactivate Lease and PPA offerings from EDDiE, cease countersigning new agreements, and all active unsigned proposals will expire. Additionally, all new shipments and project installations will be halted.

We recognize the gravity of this morning's news and the difficult position you may find yourself in. We continue to explore alternative providers to help transfer sold projects and expect more details from SunPower as soon as possible.

We deeply regret any inconvenience or hardship that this news may cause.

Thank you,

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

111.    On this news, the Company's stock plummeted nearly 75% to $0.68, making it SunPower's stock's worst week on record according to Dow Jones Market Data.  Indeed, the stock fell 40% July 18, 2024 and 55% on July 19, 2024, the close of the Class Period.

112.    On July 22, 2024, it was reported by various news outlets that SunPower was on the cusp of failing and analysts downgraded the Company to underperform and cut their price targets. "We downgrade [SunPower] to Underperform after news that the company is stopping lease and PPA installations, the most favored financing options in the industry, likely due to balance sheet constraints," Mizuho Securities analyst Maheep Mandloi wrote. "Recall that balance sheet constraints have been exacerbated due to [SunPower's] inability to raise capital without a 2023 10k filing, and a potential 6+ month further delay in 10k filing after its auditors resigned on June 27." Mizuho previously had a neutral rating for SunPower.  Mizuho reduced its SunPower price target to 50 cents from $4.00.

113.    Similarly, Susquehanna Financial Group suspended its coverage of SunPower early Monday, citing the challenges faced by the maker of solar-energy technology.  In a note released Monday, Susquehanna said it is suspending its SunPower rating and price target following the company's letter to dealers last week stating it will no longer support lease and PPA sales. "Going forward, our prior estimates, price target, and recommendations should no longer be relied upon," Susquehanna analyst Biju Perincheril wrote. Susquehanna previously had a neutral rating and price target of 68 cents for SunPower. "The letter indicates a significant retrenching by SunPower driven by an environment where it has little access to capital without current financials and exacerbated by the industrywide demand weakness," Perincheril added. "With its financial auditor resigning earlier this month, it is unclear when the company can become current with its filings, which will include a

restatement/re-audit of 2022 10K, and audited 2023 results and quarterly 2024 financials."

114.   "***We think this effectively marks the end for SPWR as an operating business***," said an analyst note from Guggenheim analyst, Joseph Osha. "***Considering the debt that the company has accumulated, we believe that SPWR's equity no longer has any value***." Osha said this decision could mark a "winddown process" for the company, which will likely sell remaining assets and delist its stock. Guggenheim Securities cut SPWR's price target from $1 to zero. Osha called SunPower's downfall a "sad end for an industry pioneer."

115.   As a result of Defendants' wrongful acts and omissions, and the resulting decline in the market value of SunPower's stock, Plaintiff and the rest of the Class have suffered significant losses and damages.

## VII.   ADDITIONAL SCIENTER ALLEGATIONS

116.   As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the documents and public statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially false and misleading. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding SunPower, and their control over and/or receipt and/or modification of SunPower's materially false and misleading statements, were active and culpable participants in the fraudulent scheme alleged herein.

117.   Defendants knew or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class

Period without the knowledge and complexity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

118.   The Individual Defendants, because of their positions with SunPower, controlled the contents of SunPower's public statements during the Class Period. The Individual Defendants were each provided with or had access to the information alleged herein to be false and misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected. Because of their positions and access to material, non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the investing public and that the positive representations that were being made were false and misleading. As a result, each of the Defendants are responsible for the accuracy of SunPower's corporate statements and is, therefore responsible and liable for the representations contained therein.

119.  Defendants and Company insiders had unusual motives and the opportunity to commit securities fraud: (i) Defendants Faricy and Eby knew, or were deliberately reckless in not knowing, that the statements about SunPower's compliance with its financial covenants and cash position were false and misleading and omitted material information; (ii) As the Company's CFO, Eby knew that SunPower's compliance with its financial covenants was material to its ability to continue as a going concern and, therefore, was material to investors.  She also understood how close the Company was to violating those covenants, especially as SunPower repeatedly reduced its guidance throughout 2023; (iii) As the Company's CFO and Principal Executive Officer, Eby and Werner, respectively, knew about the Company's ongoing accounting problems, issues with its internal controls and

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

would have been made aware of the SEC investigation, yet concealed the true facts regarding from the public   Each of the Individual Defendants were motivated by the desire to buoy investor confidence and secure an enormous the capital infusion from Sol Holdings.  They also were motivated to deceive financial advisor Houlihan, and conceal facts from Houlihan.  Finally, they desired to reassure customers with falsely bullish pronouncements for as long as possible.

## VIII.  LOSS CAUSATION

120.    During the Class Period, as detailed herein, SunPower and the Individual Defendants made false and misleading statements and omissions, and engaged in a scheme to deceive the market. These false and misleading statements and omissions artificially inflated the price of SunPower common stock and operated as a fraud or deceit on the Class (as defined above). Later, as Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, SunPower's common stock price fell significantly. As a result of their purchases of SunPower common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

## IX.    CLASS ACTION ALLEGATIONS

121.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities that purchased or otherwise acquired SunPower common stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, and directors and officers of SunPower and their families and affiliates.

122.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of March 6, 2024, SunPower had

175,477,267 shares of common stock outstanding, owned by hundreds or thousands of investors.

123.   There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)   Whether Defendants violated the Exchange Act;

(b)   Whether Defendants' statements and/or actions mispresented material facts;

(c)   Whether Defendants' statements and/or actions omitted material necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)   Whether Defendants knew or recklessly disregarded that their statements, actions, and/or omissions were false and misleading;

(e)   Whether Defendants' misconduct impacted the price of SunPower common stock;

(f)   Whether Defendants' conduct caused the members of the Class to sustain damages; and

(g)   The extent of damages sustained by Class members and the appropriate measure of damages.

124.   Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

125.   Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

126.   A Class Action is superior to other available methods for the fair and efficient adjudication of this controversy.

## X.    PRESUMPTION OF RELIANCE

127.   At all relevant times, the market for SunPower common stock was an efficient market for, among other things, the following reasons:

(a) SunPower common stock met the requirements for listing, and was listed and actively traded on the Nasdaq, a highly efficient market;

(b) As a regulated issuer, SunPower filed periodic public reports with the SEC and the Nasdaq;

(c) SunPower regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) SunPower was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s) and which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

128.   As a result of the foregoing, the market for SunPower common stock promptly digested current information regarding SunPower from publicly available sources and reflected such information in the price of SunPower common stock. Under these circumstances, all purchasers of SunPower common stock during the Class Period suffered similar injury through their purchase of SunPower common stock at artificially inflated prices and the presumption of reliance under the fraud-on-the-market doctrine applies.

129.   Further, at all relevant times, Plaintiff and other Class members relied on Defendants to disclose material information as required by law. Plaintiff and other Class members would not have purchased or otherwise acquired SunPower common stock at artificially inflated prices if Defendants had disclosed all material information as required by law. Thus, to the extent that Defendants concealed or improperly failed to disclose material facts concerning the Company and its business, Plaintiff and other Class members are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128, 153 (1972).

## XI.   INAPPLICABILITY OF STATUTORY SAFE HARBOR

130.   Neither the federal statutory safe harbor applicable to forward-looking statements under certain circumstances nor the bespeaks caution doctrine applies to any of the allegedly false statements pled herein, as the statements alleged to be false and misleading herein all relate to then-existing facts and conditions. The statutory safe harbor or bespeaks caution doctrine do not apply to statements included in financial statements prepared in accordance with generally accepted accounting principles. Moreover, none of the statements complained of herein was a forward-looking statement. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about the Company's current and historical financial accounting practices, financial condition, and internal controls, among other topics.

131.   To the extent any of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward looking statements" when made, and/or were unaccompanied by meaningful cautionary statements that identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Given the then-

existing facts contradicting Defendants' statements, any generalized risk disclosures made by the Company were insufficient to insulate Defendants from liability for their materially false and misleading statements.

132.   Alternatively, to the extent that the statutory safe harbor is found to apply to any forward-looking statements pleaded herein, Defendants are nonetheless liable for such statements because, at the time each such statement was made, the speaker had actual knowledge that it was materially false or misleading, and/or the statement was authorized or approved by an executive officer of SunPower who knew that the statement was materially false or misleading when made.

## COUNT I

**For violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5**
**(Against All Defendants)**

133.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

134.   During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

135.   Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) Employed devices, schemes, and artifices to defraud;

(b) Made untrue statements of material facts or omitted to state material facts

necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) Engaged in acts, practices, and a course of business that operated as a fraud

or deceit upon Plaintiff and others similarly situated in connection with their purchases of SunPower securities during the Class Period.

136.   The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. Defendants, by virtue of their receipt of information reflecting the true facts of the Company, their control over and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

137.   The Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

138.   As a result of the foregoing, the market price of SunPower securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity

of the market price of SunPower securities during the Class Period in purchasing SunPower securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

139.    Had Plaintiff and the other members of the Class been aware that the market price of SunPower securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased SunPower securities at the artificially inflated prices that they did, or at all.

140.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial. By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of SunPower securities during the Class Period.

141.    This claim was brought within two years from when it reasonably could have been discovered and within five years from when the violations alleged herein occurred.

## COUNT II

### For violation of Section 20(a) of the Exchange Act
### (Against Defendants Faricy, Werner and Eby)

142.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

143.    During the Class Period, the Individual Defendants participated in the operation and management of the Company and conducted and participated, directly and indirectly, in the  conduct of the Company's business affairs. Because of their

50

senior positions, they knew the adverse non-public information regarding the Company's business practices.

144.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

145.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of SunPower securities.

146.   Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

147.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

148.   This claim was brought within two years from when it reasonably could have been discovered and five years from when the violations alleged herein occurred.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

A. Declaring this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23;

B. Awarding Plaintiff and members of the Class damages with interest;

C. Awarding Plaintiff's reasonable costs, including attorneys' fees; and

D. Awarding such equitable, injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: August 6, 2024                    Respectfully submitted,

/s/ *David N. Lake*
David N. Lake
**LAW OFFICES OF DAVID N. LAKE, A**
**PROFESSIONAL CORPORATION**
16130 Ventura Boulevard, Suite 650
Encino, California 91436
Tel: (818) 788-5100
Fax: (818) 479-9990
Email: david@lakelawpc.com

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

2

**OF COUNSEL:**

Laurence D. Paskowitz
**THE PASKOWITZ LAW FIRM
P.C.**
97-45 Queens Boulevard, Ste. 1202
Rego Park, NY 11374
Tel: (212) 685-0969
Email: lpaskowitz@pasklaw.com

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## **CERTIFICATION OF PLAINTIFF**

I, Gabriel Rodrigues, do declare, as to the claims asserted under the federal securities laws, that:

1.  Plaintiff has reviewed a draft of the Complaint herein (the "Complaint") and has authorized the filing of a Complaint substantially similar to the one reviewed.

2.  Plaintiff did not purchase the security that is the subject of the Complaint at the direction of Paskowitz Law Firm PC or Law Office of David N. Lake PC or in order to participate in any private action arising under the federal securities laws.

3.  Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.  Plaintiff sets forth in the attached chart all of his transactions in the security that is the subject of the Complaint during the Class Period specified in the complaint, and certifies that the he held such shares through July 19, 2024 and beyond that date.

5.  In the past three years, Plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws.

6.  Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered, or as otherwise approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.

Signed this  2      day of August, 2024.


_____
Gabriel Rodrigues

| Company Name/Ticker | Transaction (Buy or Sale) | Trade Date | Price | Quantity |
|---|---|---|---|---|
| SPWR | Buy | 2-29-24 | 3.21 | 100 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

 **Dropbox** Sign

Audit trail

| | |
|---|---|
| **Title** | SPWR PSLRA CERT RODRIGUES |
| **File name** | SPWR_PSLRA_CERT_RODRIGUES_.doc |
| **Document ID** | 68ad5d8b642178371abeaaf860b9f1eb9cca420a |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

## Document History

| | | |
|---|---|---|
| **SENT** | **08 / 01 / 2024**<br>22:31:51 UTC-4 | Sent for signature to Gabriel Rodrigues (gabrielrodrigues777@gmail.com) from mlacoff@grwlegal.com<br>IP: 74.108.24.200 |
| **VIEWED** | **08 / 02 / 2024**<br>11:32:59 UTC-4 | Viewed by Gabriel Rodrigues (gabrielrodrigues777@gmail.com)<br>IP: 99.31.215.142 |
| **SIGNED** | **08 / 02 / 2024**<br>11:33:29 UTC-4 | Signed by Gabriel Rodrigues (gabrielrodrigues777@gmail.com)<br>IP: 99.31.215.142 |
| **COMPLETED** | **08 / 02 / 2024**<br>11:33:29 UTC-4 | The document has been completed. |